929 So.2d 398 (2006)
Bertha JOHNSON, for and on Behalf of All Wrongful Death Beneficiaries of Jekelcy Lee Johnson, Deceased, Appellant.
v.
ALCORN STATE UNIVERSITY, Appellee.
Roddel Devoual, Appellant
v.
Alcorn State University, Appellee.
Nos. 2004-CA-02543-COA, 2005-CA-00027-COA.
Court of Appeals of Mississippi.
May 23, 2006.
*401 Jenny M. Virden, and James P. Cothren, Jackson, attorney for appellants.
Mary Ann Connell, J. Cal Mayo, Oxford, attorneys for appellee.
Before LEE, P.J., GRIFFIS and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. This appeal arises from a civil lawsuit filed incident to a tragic event that occurred on the campus of Alcorn State University. On the evening of Monday, October 8, 2001, Demetrice Williams, a non-student, went onto the campus of Alcorn State, took part in a physical altercation with four female students, and eventually shot two students. One student, Roddel Devoual, survived. JeKelcy Johnson did not.
¶ 2. JeKelcy's mother, Bertha Johnson, brought a wrongful death action against Alcorn State on JeKelcy's behalf. Separately, Roddel also sued Alcorn State. Ms. Johnson and Roddel claimed that the Alcorn State campus police department negligently let Demetrice onto the campus and that Larry King, Dean of the W.S. Demby Men's Tower Dormitory, failed to protect JeKelcy and Roddel. After a bench trial before the Claiborne County Circuit Court, the circuit court entered judgment for Alcorn State. Aggrieved, Ms. Johnson and Roddel appeal and claim: (1) the circuit court erred when it found no liability for Dean King's acts, and (2) the circuit court erred when it found no liability for the campus police department's acts. Finding no error, we affirm.

FACTS
¶ 3. On the evening of Monday, October 8, 2001, Demetrice Williams and three of his friends, Tyaundra Batteaste, Terrell Chatman, and Troy Hayes, drove onto the campus of Alcorn State University. None of them were students. Alcorn State had a "Welcome Center" located at the main and rear entrances to the campus. The Welcome Center located at the main entrance to the campus operated constantly. The Welcome Center at the rear entrance to the campus operated from 7:00 a.m. until 10:00 or 11:00 p.m.
¶ 4. The record does not indicate what time Demetrice entered the campus. *402 However, during the hours of operation, a member of the campus police department stationed at one of the Welcome Centers was to "log-in" each non-student visitor that entered the campus. There is no record of Demetrice's car on the log-in sheet for that night. In fact, no one was able to locate the log-in sheet for October 8, 2001. However, portions of the record indicate that officers had discretion to suspend the log-in process when public events occurred, such as the "non-Greek" step show that took place that evening.
¶ 5. At any rate, Demetrice and his friends rode around the campus and, at an area near the men's dormitories, they happened across four female students in another car. Those four students were Kimberly Putman, Keishia Hargro, Surrenda Davis, and Sheena Scarbrough. Demetrice and his friends pulled alongside Kimberly's group of friends and tried to talk to Sheena. Apparently, Sheena was not as interested in talking to Demetrice's friend. Feeling rejected, Demetrice's friend threw beer in Sheena's face. That act escalated into a full-blown physical altercation. According to Kimberly, Demetrice and his three friends fought with Sheena and Surrenda, while she and Keishia tried to break up the fight. However, during that altercation, Demetrice or one of his friends hit Kimberly in the head with a beer bottle. Additionally, Surrenda injured her hand. After the fight stopped, Surrenda asked her friends to take her to the hospital.
¶ 6. Meanwhile, Officers Alvin Barnes, Phyllis Young, and Lawrence Coleman were in the vicinity of the men's dormitories. As the officers placed a "boot" on a car, a student approached them and told them that there had been a fight and that a female student had been beaten up. When the officers responded to the scene of the fight, they found a crowd but, by that time, all participants had left the area. The students who were still there told the officers that no one was fighting. As such, the officers returned to their other duties.
¶ 7. Independently, a student named James Clay memorized Demetrice's license plate and passed it along to Larry King. The record refers to King as the Dean of the W.S. Demby Men's Tower Dormitory. However, the record also contains a copy of Alcorn State's Operations Manual for its various residence halls. The manual refers to King as one of the two "Resident Hall Educators." Regardless, Dean King left the dorm and went to the scene of the fight. He saw the campus police officers among the students. He concluded that the officers were best equipped to handle that situation. When he heard a loud commotion in the dorm, he went back upstairs and did not report the fight.
¶ 8. Meanwhile, Surrenda did not make it to the hospital. Five or ten minutes after the initial altercation, Kimberly found her boyfriend, Roddel Devoual, at an area on campus commonly called "the park." In his deposition, Roddel said that it was about 10:40 p.m. when Kimberly found him. Kimberly told Roddel about her altercation with Demetrice and his friends. Kimberly also told Roddel that someone hit her with a beer bottle. According to Roddel, they "went to the place where it happened to see what was going on."
¶ 9. Kimberly and Roddel returned to the area near the men's dormitory. They found a large crowd around at least one stripper. Roddel estimated that there were between one hundred and two hundred people gathered together. As they scanned the crowd for Demetrice, Roddel's friend JeKelcy Johnson walked up to Roddel. JeKelcy went to high school with Roddel and they graduated the same year. JeKelcy asked Roddel about the situation.
*403 ¶ 10. Suddenly, Sheena recognized Demetrice and said "that's him." Either simultaneously or a split second after Sheena recognized Demetrice, Demetrice drew a concealed Bryco Arms .380 caliber pistol and fired in Roddel's direction. Demetrice was no more than ten or fifteen feet away when he shot Roddel and JeKelcy.
¶ 11. Demetrice shot JeKelcy multiple times, including a fatal shot to JeKelcy's head. Demetrice hit Roddel once in the right side of his chest. That bullet lodged below one of Roddel's ribs. Roddel was able to run to a building across the street. A building custodian took Roddel inside the building, locked him in an office, and called the campus police department.
¶ 12. Campus police responded to the scene of the shooting. Officers Robert Shelvy and Phyllis Young took Roddel to the Claiborne County Hospital. From there, Roddel was airlifted to the University of Mississippi Medical Center (UMMC) in Jackson, Mississippi. At UMMC, Roddel underwent surgery. Surgeons were able to remove the bullet.
¶ 13. Demetrice, with the aid of his friends, fled the scene. Demetrice was apprehended as he attempted to return to his home in Natchez, Mississippi. The Claiborne County grand jury returned an indictment against Demetrice and charged him with murder, aggravated assault, and possession of a firearm on educational property. On February 5, 2002, Demetrice, then twenty years old, filed a petition to enter a plea of guilty. In his petition, Williams submitted that he "unlawfully and feloniously by culpable negligence caused the death of JeKelcy Johnson by firing a gun in his direction when he was coming at me" and that he "unlawfully and feloniously cause [sic] bodily injury to Roddell [sic] Devoual with a handgun."
¶ 14. On February 11, 2002, the Claiborne County Circuit Court issued a sentencing order incident to Demetrice Williams's pleading guilty to manslaughter, aggravated assault, and possession of a firearm on the property of an educational facility. By way of its sentencing order, the circuit court sentenced Williams to twenty years for manslaughter, twenty years for aggravated assault, and three years for possession of a firearm on the property of an educational facility. The circuit court set the sentences to run consecutive to one another, for a total sentence of forty-three years.
¶ 15. On July 29, 2002, JeKelcy's mother, Ms. Bertha Johnson, filed a complaint in the Claiborne County Circuit Court on JeKelcy's behalf. Ms. Johnson sued Alcorn State under a cause of action for wrongful death. On November 14, 2002, Roddel sued Alcorn State.[1]
¶ 16. On October 17, 2003, Alcorn State filed a motion for summary judgment. By way of its motion, Alcorn State argued that it was not liable for JeKelcy's death or Roddel's injuries because: (a) it was exempt from liability under the Mississippi Tort Claims Act (MTCA); (b) no member of the campus police department acted in reckless disregard of either JeKelcy's or Roddel's safety and well-being; (c) all Alcorn State employees were acting within the bounds of their discretionary functions; and (d) Alcorn State could not be liable for Demetrice's intervening and superceding malicious criminal conduct.
¶ 17. On November 20, 2003, the circuit court entered its opinion and order on Alcorn State's motion for summary judgment. *404 The circuit court held that no genuine issue of material fact existed regarding the campus police officers' investigation of the reported altercation that involved Kimberly. As such, the circuit court granted Alcorn State's motion for summary judgment regarding that issue. However, the circuit court also held that there were genuine issues of material fact regarding whether the campus police department acted in reckless disregard of JeKelcy's and Roddel's safety when it allowed Demetrice to enter the campus and did not record his entry in the log-in book.
¶ 18. The circuit court took up the remaining issues in a bench trial. At the bench trial, Ms. Johnson and Roddel argued that Alcorn State was liable for JeKelcy's death and Roddel's injuries because Dean King failed to protect the students on campus. Ms. Johnson and Roddel maintained their argument that Alcorn State was liable for JeKelcy's death and Roddel's injuries because the campus police department failed to enforce its log-in policy at the Welcome Centers.
¶ 19. On November 22, 2004, the circuit court issued its findings of facts and conclusions of law. As for Dean King, the circuit court found that:
King was only responsible for the area inside his residence hall. As dormitory director, he had responsibility for proper administration of his assigned dorm which included janitorial services, mail delivery and room assignment. King had no statutory duty to perform any of his functions, much less to provide protection for the students outside of his administrative control on the school grounds. His decision not to report the tag number of the assailants to the police was an exercise of his discretion because he investigated and believed the police had things under control.
Accordingly, the circuit court found that "King's duties and actions or omissions in regard to the incident in question required him to use his judgment and discretion, therefore they are discretionary." The circuit court concluded that, "[i]n light of the fact that King's actions were discretionary, both Alcorn and King are immune from suit for King's alleged negligence pursuant to MTCA § 11-46-9(1)(d)."
¶ 20. Next, the circuit court considered whether the campus police department should be held liable for failing to screen campus visitors pursuant to its log-in policy. The circuit court found that: (a) the campus police department did not follow the rules regarding logging-in of vehicles; (b) there was no record of Demetrice entering the campus; (c) the campus police department provided no explanation for the lack of the entry in the log book; (d) the log-in procedure was intended to keep dangerous people off campus; (e) Bernadette Wilson, Chief of University police, testified that the policy was usually ignored when there was a public event on campus, like the non-Greek step show; and (f) the manual contained no exceptions for such an event. The circuit court noted its findings and held that the campus police department acted in reckless disregard for the safety of students and faculty at Alcorn State when it failed to follow its procedure for logging-in vehicles at the welcome centers. Accordingly, the circuit court found that Alcorn State was not immune under the MTCA for the acts of the campus police department.
¶ 21. Having found such, the circuit court then considered whether Ms. Johnson and Roddel presented a sufficient case of negligence. The circuit court found that Ms. Johnson and Roddel presented sufficient proof of the elements of duty and breach, but that they failed to show the necessary causal connection. The circuit court stated that, pursuant to Ms. Johnson's *405 and Roddel's allegations, when the campus police department let Demetrice enter the campus and allowed him to remain there, Alcorn State caused JeKelcy's death and Roddel's injuries. According to the circuit court:
Even had the police recorded information in the Welcome Center log book, they would not have searched the car for weapons, and they would not have discovered the perpetrators' criminal records. The Police Manual does not call for pat downs, searches, or the running [of] the records of the occupants of vehicles entering Alcorn's campus. [Johnson and Devoual] ... failed to prove that `but for' the failure of the police to log in the assailants, the shooting would not have happened.
The circuit court also found that Ms. Johnson and Roddel failed to prove proximate cause when it held:
Had the proper logging-in procedures been followed, the police officer manning the Welcome Center would still not have been able to anticipate that the admission of a car of young males onto campus on a night where several shows were taking place would lead to a shooting. None of these individuals had ever caused trouble on campus before, and [Alcorn State] does not have a history of violence. There were simply no indicators which would have led a police officer manning the Welcome Center to foresee violence. Even more dispositive of the issue of proximate cause is Demetrice Williams' intervening and superceding criminal acts which caused [JeKelcy's and Roddel's] injuries.
....
Since it has been established that the shooting was unforeseeable, [Demetrice's] criminal act was a superceding cause which relieves [Alcorn State] of liability. [Ms. Johnson and Roddel] have failed to prove their prima facie case of negligence, in particular the element of causation, therefore [Alcorn State] cannot be held liable.
¶ 22. On December 1, 2004, the circuit court entered its final judgment and ruled in favor of Alcorn State incident to all claims. Consequently, the circuit court held that Ms. Johnson take nothing from her complaint and that her complaint was "dismissed on the merits with prejudice."
¶ 23. On December 22, 2004, Ms. Johnson and Roddel appealed.

STANDARD OF REVIEW
¶ 24. Ms. Johnson and Roddel do not claim that the circuit court erred when it ruled on Alcorn State's motion for summary judgment. Rather, they claim that the circuit court erred when it granted final judgment for the University. As such, the appellants appeal from the circuit court's decision on the merits incident to the bench trial.
¶ 25. "A circuit judge sitting without a jury is accorded the same deference with regard to his findings of fact as a chancellor, and his findings are safe on appeal if they are supported by substantial, credible, and reasonable evidence." City of Jackson v. Calcote, 910 So.2d 1103(¶ 11) (Miss.2005) (internal quotations omitted). As for questions of law, including proper application of the Mississippi Tort Claims Act, this Court applies a de novo standard of review. Maldonado v. Kelly, 768 So.2d 906(¶ 4) (Miss.2000).

ANALYSIS

I. WHETHER THE CIRCUIT COURT ERRED WHEN IT FOUND THAT ALCORN STATE WAS NOT LIABLE FOR JEKELCY'S DEATH OR RODDEL'S INJURIES BASED ON DEAN KING'S ACTIONS OR FOR HIS FAILURE TO ACT.
¶ 26. The Mississippi Tort Claims Act (MTCA) provides the exclusive civil remedy *406 against state and governmental entities. Miss.Code Ann. § 11-46-7(1) (Rev.2002). State universities fall within the immunity of the MTCA. Miss.Code Ann. § 11-46-1(j) (Rev.2002). Alcorn State University is a public, state-supported institution. Miss. Code Ann. § 37-121-1 (Rev.2001). Accordingly, Alcorn State enjoys the immunity codified within the MTCA.
¶ 27. Ms. Johnson and Roddel sued Alcorn State and alleged that, through Dean King, Alcorn State negligently caused or contributed to JeKelcy's death and Roddel's injuries. The circuit court held that Dean King's acts were discretionary and concluded that Alcorn State was immune from any liability that might have resulted from Dean King's conduct. Ms. Johnson and Roddel appeal and claim that the circuit court erred when it reached that conclusion.
¶ 28. First, we consider just what duty Dean King, Alcorn State's employee, owed to JeKelcy and Roddel. The existence of a duty is a question of law. State Farm Auto Ins. Co. v. Davis, 887 So.2d 192(¶ 7) (Miss.Ct.App.2004). The circuit court found that Ms. Johnson and Roddel failed to cite a statute that imposed a duty upon Dean King to "protect students from harm outside of the dorm, or to warn students of a harmful condition on the campus...."
¶ 29. Regardless, the circuit court determined that Dean King was bound by the "discretionary acts" provision of the MTCA. Pursuant to that provision:
[Alcorn State] and its employees acting within the course and scope of their employment or duties shall not be liable for any claim ... [b]ased upon the exercise or performance or the failure to perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.
Miss.Code Ann. § 11-46-9(1)(d).
¶ 30. On appeal, Ms. Johnson and Roddel claim that the circuit court erred when it determined that Dean King's conduct fell within the "discretionary acts" provision of the MTCA. In their brief, Ms. Johnson and Roddel submit that:
[t]he trial court simply erred in concluding that [Alcorn State], acting by and through its employee Dorm Dean King, was immune from liability because he had only a discretionary duty to warn of the dangerous condition that [Alcorn State's] officials concede existed on the campus for at least a half hour period before the shootings occurred.
Pursuant to their argument, Ms. Johnson and Roddel envoke Section 11-46-9(1)(v) of the Mississippi Code. That Section states that Alcorn State is immune for any claim:
Arising out of an injury caused by a dangerous condition on property of the governmental entity that was not caused by the negligent or other wrongful conduct of an employee of the governmental entity or of which the governmental entity did not have notice, either actual or constructive, and adequate opportunity to protect or warn against; provided, however, that a governmental entity shall not be liable for the failure to warn of a dangerous condition which is obvious to one exercising due care.
Id. Additionally, Ms. Johnson and Roddel cite Lowery v. Harrison Cty. Bd. of Sup'rs, 891 So.2d 264 (Miss.Ct.App.2004) and argue that Dean King owed JeKelcy and Roddel the duty to warn them of the dangerous condition on campus and to use ordinary care in performing that duty.
¶ 31. First and foremost, neither Ms. Johnson nor Roddel raised this *407 issue in the trial court. In the circuit court's findings of fact and conclusions of law, the circuit court noted that Ms. Johnson and Roddel failed to cite "any statute which imposes a duty on a Dormitory Director to protect students from harm outside of the dorm, or to warn students of a harmful condition on campus." Appellate courts may not rule upon material matters which the trial judge did not have the opportunity to judge. Ditto v. Hinds County, Miss., 665 So.2d 878, 880 (Miss. 1995). Issues not raised at trial cannot be raised on appeal. Southern v. Mississippi State Hosp., 853 So.2d 1212(¶ 5) (Miss. 2003). Accordingly, Ms. Johnson's and Roddel's argument under the "dangerous condition" provision of the MTCA is procedurally barred.
¶ 32. Procedural bar notwithstanding, Ms. Johnson and Roddel are simply misplaced in their understanding of the "dangerous condition" exemption of the MTCA. When the MTCA refers to "dangerous conditions on property of [a] governmental entity" it refers to dangerous conditions created by the character of the property, not dangerous conditions created by human agency.[2]
¶ 33. Here, the underlying act of Ms. Johnson's and Roddel's claims is the fact that Demetrice shot JeKelcy and Roddel. Ms. Johnson and Roddel cite no authority which suggests that Alcorn State, through Dean King, had a duty to warn JeKelcy or Roddel of the dangerous condition of Demetrice's character. The reason for this is simple; there is no authority which creates that duty.
¶ 34. Despite the fact that we have found that Dean King did not have a duty to warn JeKelcy and Roddel of a dangerous condition on Alcorn State's property, we still have not determined just what duty Dean King owed JeKelcy and Roddel. In its findings of fact and conclusions of law, the circuit court found: (a) Dean King was responsible for the area within his assigned residence hall; (b) he had no statutory duty to perform his regular duties within this area; (c) he had no duty whatsoever to provide warning or protection to students outside of his dormitory, and; (d) his decision not to report the tag number of the assailants to the police was an exercise of his discretion because he investigated and thought the police had the matter under control. JeKelcy and Roddel would have us impose liability for Dean King's decision not to warn them of the danger that Demetrice posed to them.
¶ 35. Alcorn State's residence hall operations manual indicates that Dean King was responsible for certain aspects of building management, housekeeping, maintenance, and fire safety. Additionally, the manual sets forth that residence directors should supervise the residents of his assigned dormitory, establish an atmosphere conducive to learning and development, advise and counsel students regarding academic, *408 personal, social and financial matters, maintain the dormitory bulletin board, organize work schedules for student workers, handle requests for room changes, and know the students in his dorm. The manual contains duties for certain dormitory guards, but the guard's duties only involved security of the actual residence hall.
¶ 36. The undisputed proof shows that Dean King took no action in warning JeKelcy and Roddel about Demetrice because (a) Dean King only knew that people in a car bearing a particular license plate fought with four female students; (b) Dean King did not know that Demetrice was an occupant of that car, much less that Demetrice was armed with a pistol; (c) Dean King looked at the area the fight took place and saw a number of students talking with campus police officers, and; (d) Dean King believed that the campus police officers were best equipped to handle the investigation of the fight.
¶ 37. We fail to see how Dean King could owe a duty to warn JeKelcy or Roddel of anything under the circumstances. Even if we assume that Dean King owed a duty to supervise the area outside his assigned residence hall, his application of that duty would have been subject to his discretion. That is, Dean King would have been expected to apply his judgment in deciding whether to talk to campus police or to tell students that a group of potentially dangerous non-students were on campus. "When an official is required to use his own judgment or discretion in performing a duty, that duty is discretionary." Collins v. Tallahatchie County, 876 So.2d 284(¶ 17) (Miss.2004). Governmental entities retain immunity from suit based on the performance of discretionary duties or functions, "whether or not the discretion be abused." Miss. Code Ann. § 11-46-9(1)(d) (Rev.2002). As such, even if we found that Dean King owed JeKelcy and Roddel a duty outside his assigned residence hall, Dean King's duty was discretionary and cannot be the basis to impose liability upon Alcorn State.
¶ 38. Even if we further assumed that Dean King had a duty to provide some sort of police protection to JeKelcy and Roddel, Dean King would be immune from liability unless he acted in reckless disregard of JeKelcy's and Roddel's safety and well-being. See Miss Code Ann. § 11-46-9(1)(c). The "reckless disregard" standard encompasses willful and wanton action, which signifies "knowingly and intentionally" committing a wrongful act. Titus v. Williams, 844 So.2d 459(¶ 38) (Miss.2003). While stopping short of requiring intentional conduct, it embodies "conscious indifference to consequences, amounting almost to a willingness that harm should follow." Id.
¶ 39. To find that Dean King was so indifferent to the consequences that it amounted to a near willingness that Demetrice shot JeKelcy and Roddel, the facts would have to indicate that Dean King was aware that Demetrice took part in the initial altercation, that he possessed a pistol, that he would confront JeKelcy and Roddel, and that Demetrice was capable of shooting JeKelcy and Roddel. Dean King did not see the initial altercation between Demetrice and his friends and Kimberly and her friends. When James Clay brought Dean King the license plate information, Clay did not indicate that additional violence was likely or imminent. Dean King walked outside his assigned dormitory and saw campus police officers speaking with a crowd of students. Dean King did not know and had no reason to suspect that Demetrice had a pistol. Further, Dean King did not know that Kimberly reported the incident to Roddel and that they searched the campus to confront *409 Demetrice. In light of the facts of this case, there is no evidence that Dean King acted with a "conscious indifference to consequences, amounting almost to a willingness that harm should follow." No evidence suggests that Dean King, aware that an altercation had occurred outside the dormitory, could have foreseen that one of the participants would return to shoot another student. The record does not indicate that Alcorn State has a history of violence. Demetrice had no history of causing problems on campus.
¶ 40. Based on the record before us, there is no evidence that Dean King breached any duty that he owed to JeKelcy or Roddel. Dean King's conduct cannot serve as the basis of liability on behalf of Alcorn State. Accordingly, we find no error in the circuit court's decision.

II. WHETHER THE CIRCUIT COURT ERRED WHEN IT FOUND THAT ALCORN STATE WAS NOT LIABLE TO MS. JOHNSON OR RODDEL BASED ON THE CONDUCT OF CAMPUS POLICE DEPARTMENT.
¶ 41. In this issue, Ms. Johnson and Roddel appeal the circuit court's decision in which the circuit court held that Alcorn State was not liable for the campus police department's failure to apply its log-in procedure the night that Demetrice gained access to the campus. The circuit court found that Ms. Johnson's claim, as well as Roddel's claim, fell under the "police protection" provision of the MTCA. Under that provision, Alcorn State is immune from liability under any claim:
Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police. . . protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.
Miss.Code Ann. § 11-46-9(1)(c).
¶ 42. The circuit court then found that the campus police department failed to follow the written regulations governing the Welcome Centers. According to the circuit court, the campus police, therefore, acted in reckless disregard of the safety of the students at Alcorn State, including JeKelcy and Roddel.
¶ 43. Despite the circuit court's finding, the circuit court declined to find liability on behalf of the University. Instead, the circuit court found that the University was not liable to Ms. Johnson or Roddel because they failed to show the necessary causal connection. According to the circuit court:
Even had the police recorded information in the Welcome Center log book, they would not have searched the car for weapons and they would not have discovered the perpetrators' criminal records. The Police Manual does not call for pat downs, searches, or the running [of] the records of the occupants of vehicles entering Alcorn's campus.
As such, the circuit court concluded that Ms. Johnson and Roddel "failed to prove that `but for' the failure of the police to log in the assailants, the shooting would not have happened." Additionally, the circuit court found that Ms. Johnson and Roddel failed to prove that it was foreseeable that Demetrice would shoot JeKelcy and Roddel and that Demetrice's criminal acts were a superceding cause that relieved Alcorn State of liability. Ms. Johnson and Roddel appeal and claim that the circuit court erred when it found (a) they failed to prove a causal connection, (b) they failed to prove foreseeability, and (c) Demetrice's acts were a superceding cause of JeKelcy's death and Roddel's injuries.
*410 ¶ 44. Alcorn State claims that it had no duty to construct or operate the Welcome Centers, to log cars onto campus, or to conduct background checks concerning campus visitors. Alcorn State further submits that, like Mississippi's other public universities, it has no general affirmative duty to provide a safe campus environment for students. Alcorn State notes that campus police officers have the duties and obligations of a constable, and the laws that apply to any city, town, or village apply to the University. E.g., Miss.Code Ann. § 37-105-9 (Rev.2001).
¶ 45. That may very well be, but whether Alcorn State had a duty to construct the Welcome Centers, to log-in cars as they accessed the campus, or to conduct background checks of campus visitors is not the basis of Ms. Johnson's or Roddel's appeal. As Alcorn State did not file a cross-appeal to challenge the validity of the circuit court's determination of the duty campus police officers owed to JeKelcy and Roddel, we will not consider that issue on appeal.
¶ 46. Additionally, Alcorn State claims that the circuit court erred when it found that, by failing to follow the log-in procedures at the Welcome Centers, acted in reckless disregard of the safety of students. According to Alcorn State:
The only evidence placed before the [circuit court] was that a vehicle carrying four male visitors drove onto the campus without the vehicle being logged into one of the Welcome Center log books as required by the Police Department Policies and Procedures Manual. There is no proof that the officers had reason to suspect that the four visitors would become involved in an altercation with students on campus, that one of the four males carried a weapon or that one of the visitors would shoot any students. In fact, there is no evidence to suggest that the University's police officers had any way to foresee the events that later unfolded on the evening of October 8, 2001.
Plaintiffs would have the Court conclude that the vehicle carrying the four male visitors entered campus in such a suspicious manner as to alert the police officer in the Welcome Center to some lurking danger inside the vehicle. In fact, based on the evidence at trial, it is just as likely that the police officer in the Welcome Center stopped the vehicle carrying the four visitors, asked their purpose on campus, learned of their plans to attend a campus public function, and then simply failed to record the information in the log.
While Plaintiffs make much out of the Policy Manual and the instruction concerning Welcome Center operations, President Bristow and Chief Wilson both explained that they expect police officers to use their judgment in applying the Welcome Center guidelines. For example, during public events, such as the step show on the evening in question, and during routine business hours, the police officers have the discretion to vary from the strict language of the manual and to obtain less information than stated in the manual. Certainly, police officers have this discretion to exercise their judgment, particularly under a reckless disregard standard.
At best for Plaintiffs, an unknown police officer made a judgment call about logging the male visitors onto campus-just the kind of decision (whether later viewed to be right or wrong) that Section 11-46-9(1)(c) shields. No evidence suggests that a police officer acted with reckless disregard by not recording information about the vehicle carrying Demetrice Williams when the car entered campus.
*411 ¶ 47. While Alcorn State presents a persuasive argument, we will not reach the question of whether the circuit court erred when it found that campus police officers acted in reckless disregard of the safety of students when the officers failed to follow the log-in procedures dictated in the police department manual. Ms. Johnson and Roddel did not raise that issue in their brief, and Alcorn State did not file a cross-appeal. As such, that issue is not presently before this Court. We turn to those issues raised in Ms. Johnson's and Roddel's appeal.

A. Proximate Cause
¶ 48. Even if we assume that the circuit court was correct in finding reckless disregard, Ms. Johnson and Roddel must also establish that the campus police department's actions were the proximate cause of JeKelcy's death and Roddel's injuries. See, e.g., Ogburn v. City of Wiggins, 919 So.2d 85(¶ 21) (Miss.Ct.App. 2005). "Proximate cause requires: (1) cause in fact; and (2) foreseeability." Id. "Cause in fact means that the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred." Id. (internal quotations omitted). "Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others." Id. First, we examine whether Ms. Johnson and Roddel presented sufficient evidence of causation in fact.

i. Cause in Fact
¶ 49. The circuit court found that Ms. Johnson and Roddel failed to prove that "but for" campus police department's failure to log-in Demetrice, Demetrice would not have shot JeKelcy and Roddel. Ms. Johnson and Roddel claim the circuit court erred when it reached that conclusion. According to Ms. Johnson and Roddel, "[t]he trial court completely overlooked the fact that [Alcorn State's] admission procedures were far more encompassing than merely requiring the officers to enter someone's name in a log book." Ms. Johnson and Roddel cite the provisions of the Alcorn State University Police Department manual on departmental policies and procedures. Pursuant to the police department manual, an officer stationed in a Welcome Center must:
1. Greet every vehicle that is approaching a checkpoint and inquire as to the nature of their business on campus.
2. Call the party or parties involved to verify if they are expecting a visitor or know the visitor who is trying to get on campus.
3. [Make sure visitors] leave their driver license [sic] or some form of identification for verification.
The manual further dictates that the officer should transfer the visitor's identification to the Welcome Center log for record keeping and then return the identification when the visitor leaves campus.
¶ 50. Ms. Johnson and Roddel conclude that, "it is plain that had the procedures for admission or presence on campus been enforced, [Demetrice] would not have been permitted on the campus." Though they do not state so, by their argument, Ms. Johnson and Roddel seem to claim that had campus police not admitted Demetrice, then Demetrice could not have shot JeKelcy and Roddel. This is evident from their suggestion that "no credible evidence suggests that had all the procedures been followed, the men would still have been permitted to enter campus for the purpose of roaming around as late as 11:00 p.m. on a Monday evening."
¶ 51. Ms. Johnson and Roddel present an argument that is conclusory and generalized at best. It is true that, had the *412 police department prohibited Demetrice's entrance on campus, he would not have engaged in an altercation with Kimberly, Kimberly would not have found Roddel and reported the altercation, Roddel would not have ventured to the same area as Demetrice, Kimberly's friend would not have identified Demetrice, and Demetrice would not have been able to shoot JeKelcy and Roddel. However, as Alcorn State points out, there is no evidence in the record that, had an officer followed the procedure and recorded Demetrice's information in the log book, the officer would not have searched Demetrice or the car in which he arrived for weapons. The log-in procedure did not mandate searches for weapons or otherwise. The outcome would vary only in that Demetrice's name would be on record as having entered the boundaries of the campus. Because substantial, credible, and reasonable evidence supports the circuit court's decision, we find no merit to this assignment of error.

ii. Foreseeability
¶ 52. Though we are in no way required to move forward with our analysis, for the sake of argument, we consider whether it was foreseeable that Demetrice would shoot JeKelcy and Roddel when the campus police department failed to log-in Demetrice upon his entry to the campus. As we stated, "[f]oreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others." Ogburn, 919 So.2d at (¶ 21). Further, "[f]oreseeability does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." Id.
¶ 53. The circuit court found:
Had the proper logging-in procedures been followed, the police officer manning the Welcome Center would still not have been able to anticipate that the admission of a car of young males onto campus on a night where several shows were taking place would lead to a shooting. None of these individuals had ever caused trouble on campus before, and [Alcorn State] does not have a history of violence. There were simply no indicators which would have led a police officer manning the Welcome Center to foresee violence.
According to Ms. Johnson and Roddel:
There is simply no credible evidence to support [the circuit court's] conclusion, particularly in view of the trial court's recognition that the purpose of the rules [regarding logging-in of visitors] was to prevent dangerous people from entering the campus and that the Police Officers acted in reckless disregard for the students' safety in disregarding those procedures.
Ms. Johnson and Roddel cite Cumberland Telephone & Telegraph Co. v. Woodham, 99 Miss. 318, 332, 54 So. 890, 891 (1911) for the proposition that they were only obligated to present evidence of foreseeability that, "some injury, not necessarily the particular injury, or injury received in the particular manner complained of" would result from the campus police department's failure to follow the log  in procedure.
¶ 54. Ms. Johnson and Roddel conclude that "there is simply no credible evidence to support the conclusion that it was not foreseeable that students might be harmed if [Alcorn State's] policies and procedures regarding the admission of non-student to the ... campus were not followed." Even if that were the case, Ms. Johnson and Roddel are misplaced in their understanding of the relevant burden of proof. Alcorn State is not obligated to prove that, by failing to follow the log-in procedure, JeKelcy's death and Roddel's injuries were not foreseeable. Rather, Ms. Johnson and *413 Roddel were obligated to prove, by a preponderance of the evidence, that JeKelcy's death and Roddel's injuries were foreseeable. The circuit court found that Ms. Johnson and Roddel failed to meet that burden of proof. We agree.
¶ 55. If the campus police department would have followed the log-in procedure, Demetrice's name would appear in a book  nothing more. It is not foreseeable that, because the campus police did not write down his name, Demetrice would kill JeKelcy and injure Roddel. We find no error in the circuit court's decision regarding foreseeability.

B. Superceding Cause
¶ 56. For the sake of conclusion, we now consider Ms. Johnson's and Roddel's assertion that the circuit court erred when it held that "[s]ince ... the shooting was unforeseeable, [Demetrice's] criminal act was a superceding cause which relieves [Alcorn State] of liability."
¶ 57. "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Green v. Dalewood Property Owners' Ass'n, Inc., 919 So.2d 1000(¶ 19) (Miss.Ct.App.2005). We consider six factors in determining whether an intervening act qualifies as a superceding cause. Id. Those six factors are as follows:
(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.
Id.
¶ 58. Demetrice's shooting JeKelcy and Roddel is certainly not the harm that would have otherwise resulted from failing to log-in Demetrice when he entered the campus, and there is no evidence that it was anything other than an extraordinary event on the campus of Alcorn State. What is more, the police department's failure to log-in someone would not normally result in a shooting. Not only that, operation of the intervening force, Demetrice's decision to draw a pistol and shoot JeKelcy and Roddel, was entirely Demetrice's decision. The record contains no evidence that Alcorn State somehow coerced Demetrice into shooting JeKelcy and Roddel.
¶ 59. Considering our review of the relevant factors, we find that the circuit court did not err when it held Demetrice's act to be an intervening and superceding cause. For this reason, and the reasons stated above, we find no error in the circuit court's resolution of Alcorn State's liability based on the campus police department's failure to follow the department's policy on logging-in visitors to the campus.
¶ 60. THE JUDGMENT OF THE CLAIBORNE COUNTY CIRCUIT *414 COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] The Claiborne County Circuit Clerk's index of filings reflects the filing of an agreed order to consolidate Ms. Johnson's claim and Roddel's claim on December 27, 2002. The record before us does not contain a copy of that agreed order.
[2] See, e.g., Jenkins v. Miss. Dep't of Transp., 904 So.2d 1207(¶ 2) (Miss.Ct.App.2004) (motorist sued the department of transportation after he drove into a collapsed culvert); City of Clinton v. Smith, 861 So.2d 323(¶ 1) (Miss. 2003) (plaintiff sued the city after he slipped on ice as he left a municipal court building); Miss. Dep't of Transp. v. Trosclair, 851 So.2d 408(¶ 5) (Miss.Ct.App.2003) (motorist sued the Department of Transportation and claimed an unmarked three-to-six inch shoulder drop-off on newly paved highway caused her car to leave the road); Mitchell v. City of Greenville, 846 So.2d 1028(¶ 4) (Miss.2003) (motorist sued the city and alleged that a pile of dirt and debris left in road from construction caused his car to leave the road); and City of Newton v. Lofton, 840 So.2d 833(¶ 2) (Miss.2003) (plaintiff sued the city after she tripped over a newly-completed curb and broke her ankle). Even Lowery, the basis of Ms. Johnson's and Roddel's argument, dealt with loose gravel on a public road. Lowery, 891 So.2d at (¶ 4).