# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00009-COA

**SIMPSON COUNTY SCHOOL DISTRICT**                                        **APPELLANT**

**v.**

**JOANNA WIGLEY, AS THE NATURAL**                                        **APPELLEE**
**MOTHER AND ADULT NEXT FRIEND OF**
**J.L.H., A MINOR**

DATE OF JUDGMENT:                      12/02/2020
TRIAL JUDGE:                           HON. STANLEY ALEX SOREY
COURT FROM WHICH APPEALED              SIMPSON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:               STEVEN LLOYD LACEY
                                       ALLISON PERRY FRY
ATTORNEY FOR APPELLEE:                 W. TERRELL STUBBS
NATURE OF THE CASE:                    CIVIL - PERSONAL INJURY
DISPOSITION:                           REVERSED AND RENDERED - 08/30/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., McDONALD AND SMITH, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     The Simpson County School District (District) appeals from the Simpson County Circuit Court's December 2, 2020 judgment in favor of Joanna Wigley (Wigley). Wigley sued the District on behalf of her son, JLH, who was injured while on school grounds. After Wigley presented her proof, the circuit court denied the District's Rule 41(b) motion for involuntary dismissal. *See* M.R.C.P. 41(b). After the presentation of all the evidence, the circuit court entered judgment in favor of Wigley, finding that the District's failure to provide adequate supervision and care was the proximate cause of JLH's injury, which he incurred

while playing tag as he waited on his bus to be repaired. On December 29, 2020, the District appealed and now argues the following issues exist: (1) whether the trial court erred as a matter of law by denying the District's motion for involuntary dismissal as to the elements of negligence, (2) whether the trial court erred as a matter of law by entering judgment for Wigley in the absence of any supporting evidence, and (3) whether the trial court erred by rendering judgment on a claim that was not presented in the complaint and was not tried (i.e., failure to render aid). After a review of the briefs of the parties and the record, we reverse the circuit court's judgment and render judgment in favor of the District because Wigley failed to prove that the District's actions proximately caused JLH's injuries.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. At the end of the school day on September 12, 2016, JLH boarded his bus to go home. Unable to get the bus started, the substitute driver Lucille Berry instructed the students to exit the bus. All the other buses had left the school, and there were no adults outside other than Berry to supervise the students. Several students, including JLH, began playing tag.[1] After ten to fifteen minutes of playing, JLH fell and broke his leg.

¶3. Because the District was subject to the Mississippi Tort Claims Act (MTCA), on January 3, 2017, Wigley sent a notice of claim to the District. In the letter, Wigley alleged that the District was negligent in causing or allowing JLH to be injured. Wigley also alleged

---

[1] The students would run up and hit someone on the neck, "tagging" that person. The tagged person would then chase after the student that tagged him, continuing the game.

that the District was negligent in its failure to protect JLH and provide assistance to him in a timely manner.

¶4. On August 16, 2017, Wigley filed a complaint against the District in the Circuit Court of Simpson County. In her complaint, Wigley alleged the following claims for relief: (1) negligence, (2) gross negligence, (3) reckless disregard for the rights and safety of plaintiff, (4) res ipsa loquitur, (5) negligence per se, and (6) negligent infliction of emotional distress. Wigley also alleged that the District was careless, reckless, and negligent in the supervision, care, and treatment of JLH's injury. Wigley pleaded that the District had a duty of ordinary care to supervise the students under its charge. Specifically, she asserted that the District had a "duty to keep its premises reasonably safe to avoid reasonable harm." Wigley alleged that the District was responsible for the safety and security of all students and individuals present on school grounds.

¶5. On September 12, 2017, the District filed an answer to Wigley's complaint, denying all allegations alleged. The District asserted all Mississippi Rule of Civil Procedure 12(b)(1)-(6) defenses and essentially all substantive and procedural defenses available.

¶6. On March 8, 2019, the District filed a motion for summary judgment. The District argued that each claim asserted within Wigley's complaint was unsustainable or involved a discretionary function.[2] On March 26, 2019, Wigley filed a response to the District's motion

---

[2] The District argued to the trial court that Wigley's claims of negligent hiring, training, and supervision of employees, as well as negligent supervision of students, were discretionary, and consequently the District was immune from suit pursuant to Mississippi

for summary judgment. The District replied, and Wigley filed a surrebuttal on July 25, 2019.

¶7. The circuit court heard arguments on the District's motion on July 26, 2019. At the end of the hearing, the court granted summary judgment in favor of the District as to all of Wigley's causes of action except for her negligent supervision claim. The court stated that it needed to hear the evidence and testimony to fully assess whether the supervision was sufficient, so the court denied summary judgment on the issue of negligent supervision.[3]

¶8. The trial on Wigley's negligent supervision claim began on October 27, 2020. Wigley called only two witnesses: herself and JLH. JLH testified that the day of the incident had been a regular day at school. After being dismissed from school, he got on his bus, but the substitute driver, Berry, could not get the bus started. After ten minutes, she instructed the students to get off the bus. According to JLH, all the other buses had left, and other than Berry, there were no other District employees on the school grounds.[4] Berry remained on the bus for a while, continuing her efforts to start it. Some students stood against the school

---

Code Annotated section 11-46-9(1)(d) (Rev. 2019) ("A government entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."). The District did not raise discretionary function immunity on appeal; therefore this court will not address it.

    [3] On September 23, 2019, the court entered its written order granting in part and denying in part the District's motion for summary judgment. All of Wigley's claims were dismissed except her claim of negligent supervision.

    [4] JLH testified that he believed he saw a teacher named Mr. Shelton (or Sheldon) when he got on the bus, but Mr. Shelton was not present when he was injured.

building, and others began playing a game of tag. Berry eventually exited the bus and joined the students standing against the building. Meanwhile, JLH and another student S.H. joined the other students playing tag. JLH ran up and hit S.H. on his neck, and S.H. began running after him. According to JLH, as they were running, S.H. kicked him in the back of his leg, causing him to fall to the ground and lose consciousness.[5] When he woke up, his leg was bent behind him, and he saw S.H. walking away from him. JLH testified that while he was lying on the ground, Berry instructed him to get up because his knee was just dislocated. JLH told Berry that his leg was broken and stayed laying on the ground.

¶9. JLH said that after he had lain there for a while, ants started biting him,[6] and the sun became unbearable. He said he lay on the ground without receiving any assistance for about forty-five minutes. Teachers began to come outside, and after an hour or so, a janitor came out and brought JLH an umbrella for the sun and spray to kill the ants. JLH stated that "some teachers had walked up, and they were all just standing up by the building." He said that he heard Ms. Magee, the lead teacher, call his mother to inform her of the incident. JLH also

---

[5] Although the dissent claims that how JLH's injury occurred is undisputed, JLH contradicted himself and gave different versions of how and what caused him to fall. JLH told the first objective witnesses to arrive on the scene, the EMTs, that as "he was [running and] while playing he stepped from a concrete walkway to the ground that's when he said he felt his femur pop and he fell to the ground causing injury." JLH told at least two nurses at the University of Mississippi Medical Center that he was "running and tripped," but he then told the doctor that he either fell or was pushed on the playground. At trial four years later, while on direct, JLH testified that S.H. stomped his leg, causing him to fall down. However, when asked again, he testified that he fell down because S.H. kicked him.

[6] Despite his testimony, none of JLH's medical records noted or indicated that ant bites had been found on him, nor was JLH treated for ant bites.

stated that his grandfather, Mr. Petes, arrived and sat beside him for a while.  When his mother arrived, she checked on JLH and made sure he was okay.

¶10.    JLH testified that when the ambulance arrived, the EMTs had to straighten his leg to get him on the gurney.  JLH was then taken to Simpson General Hospital,[7] and from there he was airlifted to the University of Mississippi Medical Center.  JLH testified that his knee hurt all the time after the incident and that he did not have a full range of motion in his knee.  He said he walked a different way and could not play sports because his leg hurt too bad.  He testified that he had tried to play football and baseball since the injury, but his knee prevented him from being able to do so.[8]

¶11.    The District cross-examined JLH with his medical records, which were introduced into evidence.  Although JLH had testified that it took the ambulance an hour and a half to two hours to arrive at the school, the AMR records showed that an ambulance was dispatched at 3:56 p.m. and arrived at 4:36 p.m.  The records also indicated that JLH told the EMTs that he was running and fell while playing.  There was nothing in JLH's medical records or reports that S.H. had kicked or stomped on his leg – only that JLH had fallen or was pushed

[7]  According to JLH, he passed out multiple times in the ambulance on the way to Simpson General Hospital.  However, the AMR records indicated that JLH was alert and oriented when the EMTs arrived at the school.  In addition, the University of Mississippi Medical Center's records reported that JLH said he never lost consciousness.

[8]  The District attempted to impeach JLH on cross-examination with his deposition testimony in which he testified that his leg was completely healed, that he had no problems with it, and that he did play sports, including football, after the injury.  However, the court found JLH's trial testimony (that he was unable to play sports because of his injury) "very credible."

on the playground at school. JLH testified that he did not tell the medical providers everything that had happened because he was in pain.

¶12. Wigley, JLH's mother, testified that on the day of the incident she received a phone call from a teacher at the school stating that her son was hurt. Wigley immediately left work in Collins and headed to the school. While headed there, Wigley received another call from someone asking if she wanted an ambulance to be called for JLH. Wigley testified that she asked why an ambulance had not already been called, but she received no answer. Wigley arrived at the school before the ambulance and observed her son lying on the ground and unable to move. According to Wigley, her stepfather, Mr. Petes, was on the ground comforting JLH. Wigley stated that faculty members were standing in the shade against a brick wall of the school. Wigley testified that JLH was in extreme pain and had received no help prior to her arrival. JLH told her that he had screamed for help, but Berry told him there was nothing wrong with him. Wigley stated that none of the staff comforted or aided JLH while she was there.

¶13. Wigley also testified that when the ambulance arrived, the EMTs had to straighten JLH's leg so that he could be put on the gurney. The ambulance took JLH to Simpson General Hospital where he was airlifted to the University of Mississippi Medical Center. Wigley testified that after surgery JLH was in a lot of pain. JLH began physical therapy, which lasted for about three months. According to Wigley, JLH had a difficult time with physical therapy and was in extreme pain. Wigley further testified that JLH continued to

7

suffer from pain in his leg. "If he goes skating, the next day he's taking Tylenol, taking ibuprofen, [and] complaining [about] his leg." Wigley stated that after the injury, JLH attempted to play sports again, but he was not able to because his leg started bothering him.

¶14. On cross-examination, Wigley was questioned about the aid JLH had received on the day of the incident and prior statements JLH had made during his deposition. Contrary to JLH's testimony, Wigley testified that she did not recall seeing an umbrella near JLH when she arrived at the school, but she did believe that someone had brought him ant spray and water before she arrived. In response to Wigley's testimony that JLH still experienced pain in his leg, counsel for the District asked Wigley to read statements from JLH's deposition in which he testified, "I have been fine ever since they took the rods out, and it is completely healed." Wigley testified that JLH's response was just "a twelve-year-old's mindset."

¶15. After the close of Wigley's case-in-chief, the District moved for an involuntary dismissal pursuant to Mississippi Rule of Civil Procedure 41(b) and requested a judgment in its favor. The District argued that Wigley had failed to prove all elements of her negligence claim by a preponderance of the evidence. After considering the arguments of counsel, the court stated that because it was a bench trial and a close call, the District's motion for an involuntary dismissal was denied.

¶16. The District's School proceeded to call Superintendent Paes as the District's only witness. Paes had no personal knowledge of the incident, and his testimony primarily discussed excerpts from the District employee handbook. Paes was asked on direct

8

examination to read a section of the employee handbook titled "Duty." His reading follows:

> You are reminded that bus, hall, campus, lunchroom or any other duty that involves supervision of students is an important and vital part of our school program. This task, therefore, must be undertaken with serious attitude. It is your task while on duty to do the following in compliance with district policy. Watch for unsafe acts of situations and correct them.

Paes stated that this section applied to all district employees, including bus drivers. Paes also read a section titled "Duties and Guidelines" from the employee handbook, saying the following:

> The driver shall be required to perform his or her duties faithfully as a driver as providing these rules and regulations and the regulations of the state board of education. All drivers shall be responsible for the safety of each child who used his or her bus.

Paes stated that both sections worked together with one another; neither section superseded the other. Paes also testified that as the district superintendent, he never had told any bus driver that the driver had no duty to supervise students. During cross-examination, Paes admitted that the bus driver's job description did not explicitly state that drivers had a duty to supervise students when they were off the bus.

¶17. On December 2, 2020, the court entered judgment in favor of Wigley, awarding damages in the amount of $287,000. The court found that the District had breached its duty to properly supervise JLH and the other students while they were playing and that breach was a direct and proximate cause of JLH's injury. The court further found that "there had been a considerable breach of duty on the part of the District's response and care" for JLH after he was injured. At one point in its final order, the court stated that "[t]he evidence indicated

9

that [JLH] was on the ground for at least thirty to forty minutes before anyone at the school even called an ambulance or notified his mother." However, later in its order, the court stated that "[t]he evidence clearly showed that no school personnel called [JLH's] mother or an ambulance for approximately at least 20-30 minutes." The court also found that the "evidence clearly showed a lack of urgency on the part of the District to seek medical attention for a severely injured child."

¶18. On December 29, 2020, the District appealed and now argues the following issues exist: (1) whether the trial court erred as a matter of law by denying the District's motion for involuntary dismissal as to the elements of negligence, (2) whether the trial court erred as a matter of law by entering judgment for Wigley in the absence of any supporting evidence, and (3) whether the trial court erred by rendering judgment on a claim that was not present in the complaint and was not tried (i.e., failure to render aid).

**STANDARD OF REVIEW**

¶19. "A circuit judge sitting without a jury is entitled to the same deference accorded to a chancellor, that is, we will uphold the circuit judge's findings of fact, so long as they are supported by substantial, credible, and reasonable evidence." *Mauldin Co. v. Turnage*, 332 So. 3d 331, 335 (¶6) (Miss. Ct. App. 2021). "[T]his court ought and generally will affirm a trial court sitting without a jury on a question of fact unless, based upon substantial evidence, the court must be manifestly wrong." *Jackson Pub. Sch. Dist. v. Smith*, 875 So. 2d 1100, 1102 (¶9) (Miss. Ct. App. 2004) (citing *Ezell v. Williams*, 724 So. 2d 396, 397 (¶4)

10

(Miss. 1998)).

## DISCUSSION

**I. Whether the trial court erred as a matter of law by denying the District's motion for involuntary dismissal based on insufficient evidence of negligence.**

¶20. The District argues that the trial court erred by denying its Rule 41(b) motion for involuntary dismissal. However, the District waived any error in the court's failing to grant a directed verdict at the close of Wigley's case when the District introduced evidence in its own behalf. In *PACCAR Financial Corp. v. Howard*, 615 So. 2d 583 (Miss. 1993), the Mississippi Supreme Court stated:

> In both jury and non-jury cases, civil and criminal, we have repeatedly held that where a defending or responding party, following the overruling of a motion for a directed verdict or a motion to dismiss, goes forward with evidence of his own, he waives the right to assign on appeal error in the failure of the trial judge to grant his motion.

*Id.* at 586-87 (quoting *Clements v. Young*, 481 So. 2d 263, 268 (Miss. 1985)). Accordingly, the District waived its right to challenge the trial court's denial of the District's Rule 41(b) motion as error on appeal.

**II. Whether the trial court erred as a matter of law by entering judgment for Wigley.**

¶21. The District argues that Wigley failed to produce sufficient evidence to prove each element of the negligent supervision claim. To prove a negligent supervision claim, "a plaintiff must establish by a preponderance of the evidence the existence of a duty of care, a breach of that duty, proximate causation, and compensable damages." *Stephens v. Miller*,

11

970 So. 2d 225, 227 (¶6) (Miss. Ct. App. 2007). The supreme court has held that Mississippi Code Annotated section 37-9-69 (Rev. 2014)[9] imposes upon school districts "a ministerial duty . . . to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment." *Smith ex rel. Smith v. Leake Cnty. Sch. Dist.*, 195 So. 3d 771, 777 (¶17) (Miss. 2016). To establish that a breach has occurred "a plaintiff, even a child, has [the] burden of showing that school district employees [did] not perform the duties to which they [were] assigned." *T.K. ex rel. D.K. v. Simpson Cnty. Sch. Dist.*, 846 So. 2d 312, 316 (¶12) (Miss. Ct. App. 2003). "Liability only attaches when a school fails to utilize ordinary care to prevent foreseeable injury." *Id*. at 317 (¶16).

¶22. Moreover, "[t]here must [also] be a proximate causal connection between the inadequacy or lack of supervision and the accident." *Summers ex rel. Dawson v. St. Andrew's Episcopal Sch.*, 759 So. 2d 1203, 1212 (¶38) (Miss. 2000). A plaintiff must show that the "injury sustained . . . was a reasonably foreseeable consequence of the defendant's negligence." *Williamson v. Daniels*, 748 So. 2d 754, 759 (¶14) (Miss. 1999). In other words,

---

[9] Mississippi Code Annotated section 37-9-69 states:

It shall be the duty of each superintendent, principal and teacher in the public schools of this state to enforce in the schools the courses of study prescribed by law or by the state board of education, to comply with the law in distribution and use of free textbooks, and to observe and enforce the statutes, rules and regulations prescribed for the operation of schools. Such superintendents, principals and teachers shall hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess.

a plaintiff must show that the injury would not have occurred had there been adequate supervision present. *See Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1277 (¶32) (Miss. 2007). "Factual findings will not be reversed if supported by credible evidence." *T.K.*, 846 So. 2d at 316 (¶9).

¶23. Although the District challenges the circuit court's finding that the District breached its duty of care, an in-depth discussion of that element of negligence is not necessary because Wigley failed to produce sufficient evidence of causation. "Even if a party is negligent, he is not liable to the plaintiff unless the negligence is the proximate cause of the injury." *Knox v. Mahalitc*, 105 So. 3d 327, 329 (¶7) (Miss. Ct. App. 2011). "Proximate cause requires the fact finder to find that negligence was both the cause in fact and the legal cause of the damage." *Id*. "The cause in fact of an injury is that cause which, in natural and continuous sequence unbroken by any efficient intervening cause, produces the injury and without which the injury would not have occurred." *Glover*, 968 So. 2d at 1277 (¶32). "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Johnson v. Alcorn State Univ.*, 929 So. 2d 398, 413 (¶57) (Miss. Ct. App. 2006). Negligence will be deemed the legal cause if the injury "is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act." *Glover*, 968 So. 2d at 1277 (¶33). "Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act

13

created for others." *Johnson*, 929 So. 2d at 411 (¶52).

¶24.    These principles have been applied in several cases alleging negligent supervision. In *Glover,* a program participant sued the program organizer, bus driver, and others[10] alleging that she was raped by two male participants when the bus driver dropped them off at the wrong building. *Glover*, 968 So. 2d at 1271 (¶8). Upon learning that he had dropped the children off at the wrong building, the driver returned and had the children get back on the bus. *Id*. However, he did not notice that Glover and the two males did not get back on. *Id*. The driver left, leaving the three children unattended and unsupervised. *Id*. The circuit court granted summary judgment for the university finding that Glover's injuries were not foreseeable, that the university was not the proximate cause of Glover's injuries, and that the boys' actions were superseding, intervening causes. *Id*. at 1273 (¶15).

¶25.    However, the Mississippi Supreme Court reversed, holding that a reasonable fact finder could have found that Glover's injuries and damages were a foreseeable consequence of the university's negligence. *Id*. at 1279 (¶42). Evidence was presented at trial showing that a few days earlier a student had reported to the driver that Glover had been inside the boy's restroom, but the driver failed to investigate the report.[11] *Id*. at (¶40). Thus, the

---

[10] The parties included Jackson State University which had sponsored the program and leased the bus that transported the students.

[11] On the Monday prior to the rape incident, the bus driver had been informed by another program participant that a girl was in the boy's bathroom. *Glover*, 968 So. 2d at 1271 (¶8). Although the bus driver found Glover and another girl standing outside the boy's restroom, he investigated no further. *Id*. Later, one of the alleged rapists later admitted that he and Glover had, in fact, been in the boy's restroom having sex on this occasion. *Id*.

14

Supreme Court held that the driver should have foreseen that an incident of a sexual nature might occur if the girl and the boys were left unattended. *Id*. Glover further presented evidence that on the day of the incident, the university was also aware of the violent tendencies of the two male participants who previously had been expelled from the program for fighting. *Id*. Moreover, sixty-three crimes, including a rape, had occurred on the campus during the three months prior to the rape. *Id*. at (¶41). The Supreme Court found no merit to the university's argument that the rape was an intervening superseding cause excusing them of liability, stating that "where the intervening cause of [an] injury was foreseeable, it cannot supercede the liability of the defendant." *Id*. at (¶43). The court concluded summary judgment was inappropriate, and the case should have been tried. *Id*. at (¶42).

¶26.    In *Chaffee*, the Mississippi Supreme Court held that a student's injuries were not the foreseeable result of inadequate supervision. In that case, Chaffee sued the Jackson Public School District alleging negligence and res ipsa loquitur after her son, Fredrick, was injured when his finger got caught in the crack of the classroom bathroom door. *Chaffee ex rel. Latham v. Jackson Pub. Sch. Dist.*, 270 So. 3d 905, 906 (¶4) (Miss. 2019). Fredrick's teacher, Scott, who was at the front of the classroom, instructed the students to line up for lunch. *Id*. at (¶3). Fredrick and another student got out of line and ran to the back of the classroom to use the single restroom.[12] *Id*. Anderson, the teaching assistant, was at her desk in the back near the restroom. *Id*. "Fredrick was injured when his hand slipped off the door

---

[12]  Scott testified that she told Frederick and the other student that they did not have permission to go to the back of the classroom, and she called for them to come back in line, which they did not do. *Chaffee*, 270 So. 3d at 908 (¶14).

15

and his finger got caught in the crack of the door as the other [student] was closing it." *Id.* at (¶4). Immediately after the injury occurred, Scott went to the back of the classroom and wrapped Frederick's finger in paper towels and took him to the principal's office. *Id.* Finding that adequate supervision had been provided and granting the school district's motion for summary judgment, the circuit court stated, "I'm not sure what the school district or the teacher or the administrative assistant could have done differently other than what they did for this aberrant injury in the bathroom." *Id.* at 906 (¶6). On appeal, Chaffee argued that Fredrick's injuries were foreseeable based on the established classroom rule that only one child should be sent to the restroom at a time. *Id.* at 908 (¶17). However, the Mississippi Supreme Court, affirming the circuit court's grant of summary judgment, stated that "even if Scott and Anderson were standing directly next to Fredrick at the time of the incident, it was not foreseeable that his hand would slip and that the teachers would have been able to prevent his injury." *Id.* at 909 (¶18). The supreme court held that there were no facts offered which suggested that the "incident was reasonably foreseeable and preventable by the taking of reasonable precautions." *Id.* at (¶21). The court further stated that "[b]y all accounts, the injury to Fredrick occurred suddenly and accidently." *Id.*

¶27.    In *Amos*, this court upheld a trial court's order granting a school district's motion for a involuntary dismissal after finding that the student's injuries were not foreseeable. *Amos ex rel. Amos v. Jackson Pub. Sch. Dist.*, 139 So. 3d 120, 125 (¶¶15-19) (Miss. Ct. App. 2014). In that case, a father filed a negligence action against the school district for injuries his son, Derrick, suffered during a recreational football game at school. *Id.* at 122 (¶2). On

16

the day of the incident, Derrick's math teacher took the class outside as a reward for the class's positive examination results. *Id*. Several students decided to play a game of football and Derrick voluntarily joined them. *Id*. "During the game, Derrick broke his thumb when he tackled another student." *Id*. Derrick's teacher testified that "he witnessed at least one tackle prior to Derrick's injury and instructed the students not to tackle." *Id*. At the close of Amos's evidence, the school district moved for directed verdict on the ground that Amos failed to meet the necessary elements to establish negligence. *Id*. at 122-23 (¶5). In ruling from the bench, the trial court stated "there is no negligence in taking children outside." *Id*. at 124 (¶11). The trial court further stated that "no one could foresee that Derrick would try to tackle a larger student than himself, causing the larger student to fall on his thumb. Unusual, unpredictable, and unbelievable." *Id*. We held that "based on the record before us, it [was] clear that the trial court considered the evidence and testimony in rendering [its] judgment." *Id*. at 125 (¶17). Therefore, "viewing the evidence fairly, we [found] that the trial court's judgment was based on substantial evidence." *Id*.

¶28. In the final judgment in this case, the circuit court concluded that the District's requiring JLH and the other students to remain on campus allegedly unsupervised was the proximate cause of JLH's injury. Specifically, the court stated:

> This Court recognizes that a school district does not have the duty of providing constant supervision of all movements of pupils at all times. There must be a proximate causal connection between the inadequacy or lack of supervision and the accident. *Levandoski v. Jackson Cnty. Sch. Dist.*, 328 So. 2d 339, 342 (Miss. 1976). However, in this situation it was not normal school time wherein the students were expected to be in class, the lunchroom, playground or the like. This situation was one where students were left essentially unsupervised on campus outside normal circumstances for some period of

17

time. The Court also notes that the School District attempted to contradict [JLH's] testimony by stating that a Ms. Berry and Mr. Sheldon[13] were present. The Court herein finds that being present and actively supervising students are distinguishable acts. Because the school caused the students to remain on campus (as compared to students coming back on campus on their own accord) the duty remained with the school to supervise the students. The School District failed in this obligation.

Although the circuit court cited the appropriate law on causation, it provided no facts proving causation in this case. Simply instructing a child to exit a disabled bus and wait on school grounds with the bus driver present did not cause JLH to be injured.

¶29. This case turns on the foreseeability of JLH's injury while he was waiting for the bus to be repaired. At trial, JLH testified that he and the other students had been playing tag for ten to fifteen minutes before he was injured. JLH stated that tag was a regular game he frequently played at school, and prior to this incident, "no one had ever broken their leg playing tag." Like the students in *Amos*, JLH was voluntarily playing tag. Moreover, unlike the facts in *Glover*, there was no evidence here that there were prior incidents of conflict or animosity between JLH and S.H. that the District should have known to have foreseen any intentional conduct by S.H. JLH was playing in full view of Berry, and no evidence was presented that the students were playing unusually roughly to warrant intervention by Berry. As stated in *Chaffee*, Wigley did not offer any facts "which suggest that this incident was reasonably foreseeable and preventable by the taking of reasonable precautions." *Chaffee*, 270 So. 3d at 909 (¶21). Like in *Chaffee*, JLH's injury happened suddenly and accidently.

---

[13] As previously stated, JLH testified that he believed he saw Mr. Shelton as he was going to get on the bus. However, Mr. Shelton was not present when JLH was injured, nor did he testify at trial.

18

Further, JLH's injury could not have been foreseen even if more supervision had been present. Without supporting proof, we find that the circuit court was manifestly wrong in finding that the District's actions were the proximate legal cause of JLH's injury.[14]

### III. Whether the circuit court erred in finding that the District breached a duty to render aid and caused JLH's injury.

¶30. In its final judgment, the circuit court found that the District had breached a duty to render aid to JLH as well stating:

> [E]ven if the School District did everything reasonably within its power to properly supervise the Plaintiff and other students on the day in question, which the evidence shows they did not, *there was still a considerable breach of duty on the part of the School District's response and care for the Plaintiff.* Failing to immediately call for medical assistance is a clear breach of any standard of care for a School District. There was no evidence which contradicted the Plaintiff's assertion that he lay on the ground for a very long time. The evidence clearly showed that no school personnel called his mother or an ambulance for approximately at least 20-30 minutes. Further, the evidence clearly showed a lack of urgency on the part of the School District to seek medical attention for a severely injured child.

(Emphasis added).[15]

¶31. The District argues that the circuit court erred in rendering a judgment on a failure to render aid claim, contending that the claim was never pleaded or tried. However, a review of Wigley's complaint shows that she did raise failure to render aid as a part of her negligent supervision claim. In paragraph 6, she pleaded "[JLH] was left unattended while injured and

---

[14] The District also argues that S.H.'s conduct was a superseding cause of JLH's injuries. However, in light of our ruling that the District's actions did not cause JLH's injury, we need not discuss any superseding cause.

[15] In her brief, Wigley considered the circuit court's ruling as "mere dicta" and did not defend the court's ruling on that issue. But because it is specific enough, and may be Wigley's only hope of prevailing, we will address it.

lying on the campus grounds." She followed this in paragraph 7, which including the District's failure to render aid as part of her negligent supervision claim, specifically stating:

> Defendant was careless, reckless, and negligent in the supervision, care and *treatment* of [JLH], a minor, in the following ways, to wit:
>
>     a.    allowing a dangerous environment to exist while students are waiting for their buses.
>
>     b.    acting with deliberate indifference toward the plaintiff;
>
>     c.    failing to use proper procedures;
>
>     d.    failing to properly supervise its students*;*
>
>     e.    the act(s) and/or omission(s) in question constitute a reckless disregard for the rights and safety of Plaintiff and others; and
>
>     f.    other acts of negligence as will be more fully shown at trial.

This claim was reiterated in paragraph 8 of Wigley's complaint.

¶32. "Mississippi is a 'notice-pleadings' state, which means:

> [U]nder our rules, [the plaintiff] is not required to plead the specific wrongful conduct. At the pleading stage, he is required only to place [the defendant] on reasonable notice of the claims against it and to demonstrate that he has alleged a recognized cause of action upon which, under some set of facts, he might prevail.

*Cook v. Wallot*, 172 So. 3d 788, 796 (¶25) (Miss. Ct. App. 2013). In this case, Wigley's complaint put the District on notice that she was alleging that the District's failure to render aid constituted a breach of its duty to supervise JLH.

¶33. In addition, Wigley presented evidence at trial on the claim. JLH testified that he was lying in the sun on the ground being bitten by ants for forty-five minutes before anyone came to help him. The District did not object to this testimony but argued to the court that the

20

timeline of events contradicted JLH's testimony, creating an issue of fact for the court to resolve. Therefore, the issue was tried.

¶34. Although Wigley pleaded and attempted to prove negligent supervision by the District's failure to render aid, she presented no legal authority in which an appellate court has ruled that the obligation to render aid is part of the duty to supervise.[16] On the facts and record before us, we decline to rule on that issue now because even if it were a part of the duty to supervise, Wigley failed to prove that the District's alleged failure to render aid caused JLH's damages.

¶35. Based on the record, it is uncontested that JLH was released from school at 3:17 p.m. He testified that he was on the bus for ten minutes while Berry attempted to start the bus. According to JLH, he exited the bus around 3:27 p.m. JLH testified that after exiting the bus, he played tag for ten to fifteen minutes before he was injured. Therefore, based on JLH's own testimony, his injury occurred sometime between 3:27 p.m. and 3:42 p.m.

¶36. JLH stated that after he was injured, Berry approached him and told him to get up. He informed her that his leg was broken and continued lying on the ground. JLH testified that he heard Ms. Magee, the lead teacher who arrived, call his mother as well as 911. Although the record does not indicate when the 911 call was placed, the AMR records indicate that they received a dispatch notice at 3:56 p.m. Thus, because JLH heard the calls,

---

[16] Mississippi courts have recognized that the failure to render aid is a separate cause of action in premises liability cases. *See Spotlite Skating Rink Inc. v. Barnes ex rel. Barnes*, 988 So. 2d 364, 369 (¶17) (Miss. 2008); *Grisham v. John Q. Long V.F.W. Post, No. 4057 Inc.*, 519 So. 2d 413, 417 (¶9) (Miss. 1988). However, the circuit court in this case dismissed Wigley's premise liability claim in the court's partial summary judgment.

the teacher had to have made them between 3:42 p.m. and 3:56 p.m. at the latest.

¶37.    Based on these undisputed records and JLH's own testimony, within fourteen to nineteen minutes of JLH's injury, professional medical assistance was on the way. Therefore, the court's finding that the evidence indicated that JLH was on the ground for thirty to forty minutes before an ambulance was called was manifestly wrong.[17]  In addition, the records show that within that fourteen-to-nineteen-minute window of time, Berry approached JLH to determine his injury, a janitor brought JLH an umbrella and ant spray, Ms. Magee came to the scene and called his mother twice, and Ms. Magee proceeded to called 911, which then sent a dispatch notice to AMR.  This undisputed timeline and the actions of the District do not constitute a failure to render aid.  We also note that because JLH's injury was so severe, moving him without the assistance of medical personnel would have exposed the District to further potential liability.[18]

¶38.    The records indicate that the ambulance was dispatched at 3:56 p.m. and arrived at the school at 4:36 p.m.  Although the ambulance took forty minutes to arrive, this delay was not caused by the District.  Moreover, Wigley presented no proof that the District's alleged failure to render aid aggravated JLH's injury.  In *Grisham*, 519 So. 2d at 417, the supreme court required proof that the failure to render aid resulted in an aggravation of the plaintiff's

[17] The partly concurring opinion contends that we should defer to the findings of the trial court, which sat as the trier of fact.  However, such deference is not appropriate when the trial court's findings are manifestly wrong.  *See Jackson Pub. Sch. Dist. v. Smith*, 875 So. 2d 1100, 1102 (¶9) (Miss. Ct. App. 2004).

[18] It should also be noted that JLH's grandfather arrived even before JLH's mother and the medical personnel.  Neither JLH's grandfather nor his mother attempted to move JLH before the ambulance arrived.

22

injuries. Grisham's failure to provide that proof warranted a dismissal of her claim based on the fact that she was unable to "make any showing as to an essential element[] of her claim, proximate cause." *Id*. With the overwhelming proof that JLH suffered no damages from any failure to render aid, the circuit court's finding was clearly erroneous and must be reversed.

¶39.     It is axiomatic that in a negligence action, the plaintiff has to prove not only duty and breach of that duty, but also causation and damages. The dissent wholly fails to address the issue of causation either in a negligent supervision case or in the case of failure to render aid. The dissent cites *Henderson ex rel. Henderson v. Simpson County Public School District*, 847 So. 2d 856 (Miss. 2003), to support its contention that the District breached a duty of ordinary care in failing to supervise JLH prior to his fall. However, *Henderson* is not a failure-to-render-aid case but instead a case involving a failure to intervene prior to an injury, and its facts are clearly distinguishable from the facts in this case. *See id*. at 857-58 (¶5). If anything, *Henderson* supports our finding that Wigley failed to prove the causation element of either a negligent supervision claim or a failure to render aid claim.

¶40.     In *Henderson*, a student brought a negligence action against the district after he was taunted and assaulted by Price, another student, in the presence of their teacher. *Id*. at 857 (¶1). On the day of the incident, Henderson was helping another student when "Price walked over to Henderson's desk and made threatening gestures such as drawing his fist back several times as if to hit Henderson." *Id*. at (¶2). After Price made the threatening gestures for at least a minute, he struck Henderson, punching him so hard that he and his desk toppled to the floor. *Id*. The circuit court granted summary judgment in favor of the District. *Id*. at

23

(¶4). However, the Mississippi Supreme Court reversed and remanded the case after finding that there was "an issue of fact as to whether the teacher had adequate time and, indeed, a duty, to intervene in the situation while Price was standing over Henderson brandishing his fist for at least one minute." *Id*. at 857-58 (¶5). The court further stated that "[t]he teacher's action or inaction bears on the question of ordinary care by the teacher in supervising her class and her awareness of what was transpiring." *Id*. at 858 (¶6).

¶41.    Here, unlike in *Henderson*, there was no evidence presented to indicate that Berry should have foreseen any conflict brewing between JLH and S.H., which would have prompted her to action. Unlike the teacher in *Henderson*, who observed Price taunting and threatening Henderson for at least a minute before Henderson was struck, nothing in the facts of this case suggests that Berry observed any aggressive behavior by S.H. There was no loud taunting or indication whatsoever that S.H. would cause harm to JLH; they were simply playing tag. JLH's injury occurred suddenly, without notice, and it was not foreseeable that JLH would break his leg. Even the dissent acknowledges *Henderson*'s holding that "there is no liability predicated on lack or insufficiency of supervision where the event in connection with which the injury occurred is not reasonably foreseeable." *Henderson*, 847 So. 2d at 857 (¶3) (citing *Levandoski v. Jackson Cnty. Sch. Dist.*, 328 So. 2d 339, 342 (Miss. 1976)).

¶42.    The dissent further asserts that allowing a child to remain on the ground in the hot sun with a broken leg for *any* period of time before calling 911 was also a breach of the District's ministerial duty entitling JLH to compensation. The dissent criticizes our separation of the

24

two potential theories of liability (breach of duty to supervise prior to fall and breach of duty to render aid thereafter). Both negligent supervision and failure to render aid were pled in Wigley's complaint. Although Wigley alleged a failure to render aid claim within her negligent supervision claim, the trial judge analyzed and ruled on the two theories separately, following the precedent in premise liability cases such as *Grisham v. John Q. Long V.F.W. Post Inc.*, 519 So. 2d 413 (Miss. 1988), where the failure to render aid has been analyzed as a separate cause of action. In *Grisham*, Mabeline brought an action against V.F.W. for failure to keep its premises in a reasonably safe condition after she was assaulted outside of the premises. *Id*. at 414. Mabeline also alleged that V.F.W. was negligent in its failure to render aid after she was injured. *Id*. The trial court entered summary judgment in favor of the V.F.W. and Mabeline appealed. *Id*. at 415. On appeal, the Mississippi Supreme Court separately analyzed the duties V.F.W. owed to Mabeline and whether or not V.F.W. was liable for its failure to act when it learned of her injuries. The court held that although the V.F.W. "had an affirmative duty to aid Mabeline once they learned that she had been injured on V.F.W. premises," the court found that Mabeline "made absolutely no showing that this omission on the part of the V.F.W. resulted in any aggravation of her injuries." *Id*. at 417. Likewise, although we empathize and acknowledge the fact that JLH was in extreme pain, the record fails to show that his injury was aggravated by any alleged failure to render aid.[19]

---

[19] The partly concurring opinion states that because JLH lay on the ground for some time, he could be entitled to damages for mental and emotional distress. But the circuit court made no such findings. It held that the District breached its duty to supervise and that "breach of the duty was a direct and/or proximate cause of the Plaintiff's injuries." The circuit court further stated that "even if the School District did everything reasonably within its power to properly supervise the Plaintiff and other students on the day in question, . . .

**CONCLUSION**

¶43.    Because Wigley failed to produce sufficient evidence to support a finding that lack of supervision was the proximate cause of JLH's injuries, we find that the circuit court was manifestly wrong in its ruling in favor of Wigley.  Moreover, we find that Wigley failed to prove that JLH's damages were caused by any alleged failure to render aid.  Accordingly, we reverse and render judgment in favor of the District.

¶44.    **REVERSED AND RENDERED.**

        **BARNES, C.J., WILSON, P.J., GREENLEE, SMITH AND EMFINGER, JJ., CONCUR.  WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.  LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.  McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J.; WESTBROOKS AND LAWRENCE, JJ., JOIN IN PART.**

        **LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶45.    I concur with the majority in reversing the trial court's verdict finding the school district failed to properly supervise the students after they were removed from the bus. After a review of the evidence, I agree that there was no substantial, credible, or reliable evidence to prove the school district did anything improper that proximately caused the child to break

there was still a considerable breach of duty on the part of the School District's response and care for the Plaintiff."  However, the circuit court made absolutely no finding of proximate cause of any injury resulting from the breach of the duty to render aid, be it aggravation of JLH's physical injury or a separate injury of mental distress.  The circuit court cited several facts to support the *breach* of the failure to render aid claim but cited no facts or findings to support *causation* of any injury.  Moreover, Wigley's complaint pled numerous claims, including emotional distress.  But on summary judgment, the circuit court dismissed all her claims except the negligent supervision claim.  Thus, the claim for emotional distress was dismissed on summary judgment.

his leg. However, I disagree with the majority as to the trial court's determination that the school district failed to render sufficient aid after the child broke his leg. I join the dissent in part in its discussion of that issue. A review of our long-established standard of review compels me to take my positions in this case.

¶46. "[W]e apply the substantial-evidence standard of review" to "the factual findings of [a] circuit court sitting as the sole trier of fact in a bench trial . . . ." *City of Jackson v. Hilton*, 324 So. 3d 1164, 1170 (¶18) (Miss. Ct. App. 2021) (quoting *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 23 (¶35) (Miss. Ct. App. 2012)). "[W]e must accept that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the circuit court's findings of fact." *Id*. (internal quotation marks omitted) (quoting *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 747 (¶26) (Miss. 2008)).

¶47. The circuit court has the sole authority for determining the credibility of witnesses when it sits as the trier of fact. *City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (¶14) (Miss. 2003). A circuit court judge sitting as the trier of fact is given the same deference with regard to his fact-finding as a chancellor, and his findings are safe on appeal when they are supported by substantial, credible, and reliable evidence. *Maldonado v. Kelly*, 768 So. 2d 906, 908 (¶4) (Miss. 2000). Questions concerning the application of the MTCA are reviewed de novo. *Donaldson v. Covington County*, 846 So. 2d 219, 222 (¶11) (Miss. 2003). Immunity is a question of law. *Mitchell v. City of Greenville*, 846 So. 2d 1028, 1029 (¶8) (Miss. 2003).

¶48. At trial, Jacob testified he "laid there for a while," ants started biting him, and the sun was "unbearable." When asked if anyone helped him, his answer was "not for a while." He thought it was "a good 45 minutes" before he got help. Further, his mother Wigley drove from Collins, Mississippi, to Mendenhall, Mississippi, and when she arrived, she saw her son lying on the ground with no school personnel around offering any assistance.[20] The circuit court judge was the trier of fact in this case and, in listening to the testimony and judging the credibility of the witnesses, determined the school district failed to render aid after Jacob broke his leg. Since the trial court determined the school district was liable for its failure to render aid, the court had a second duty to then determine damages. The court determined damages as a result of both the failure to supervise and the failure to render aid, and the court assessed damages in the amount of $287,000. The court did not specify the amount of damages the plaintiff incurred as a result of the failure to supervise versus the failure to render aid. Since I believe that the liability for failure to supervise was not supported by substantial evidence and that this portion of the judgment should be reversed, I would remand the case to the trial court for a determination of damages that relates to the substantial evidence proving the failure-to-render-aid claim. *See Int'l Assoc. of Certified Home Inspectors v. HomeSafe Inspection*, 335 So. 3d 583, 599 (¶75) (Miss. Ct. App. 2022).

¶49. In summary, I agree with the majority in concluding that there was a lack of substantial evidence of any negligent supervisory act that caused the child to break his leg when the school bus suddenly became inoperable. Further, I believe there was substantial,

---

[20] The trial court specifically found these facts to exist in its final order.

credible, and reliable evidence supporting the trial court's factual determination that the school district failed to render sufficient care after the child broke his leg on school property.[21] Therefore, I concur in part with the majority as to the failure-to-supervise claim, and join in part with the dissent as to the failure-to-render-aid claim; and I would remand the case for determination of damages as to only claim the evidence supported.

**WESTBROOKS, J., JOINS THIS OPINION.**

**McCARTY, J., DISSENTING:**

¶50.	When the medics arrived they found the little boy crumpled on the ground by his school. The eleven-year-old had passed in and out of consciousness since his leg snapped. His limb was twisted up behind him, and his sisters were standing nearby crying. Before his mother had gotten to the school, ants had crawled on him and bitten him.

¶51.	The boy told the medical personnel his pain was a ten out of ten on the pain scale. They gave him morphine to alleviate his suffering as they began to try to shift his leg. His mother held him down as the EMTs worked to straighten the leg before he was airlifted for surgery.

---

[21] The majority takes issue with this opinion's failure to address the causation issue. The majority asserts that the failure to render care was never proved to have caused an aggravation or to have caused an additional injury to the already-broken leg. I agree there was a lack of proof in the record demonstrating an additional injury or aggravation of the child's broken leg as a result of the child lying on the ground without appropriate medical care for whatever amount of time he was there. However, as the court clearly found, the child certainly lay there for some time and during that time suffered some compensable damages for the delay in care. For example, mental and emotional distress could be one such type of damage. The amount of those damages should be decided by the trier of fact, and that is precisely why I would remand the case to the trial court for a clarification of damages.

¶52. After hearing the witnesses and viewing the proof, the trial court made a finding of fact that the boy was left "essentially unsupervised" by the school district. The trial court also found the school district's delay in calling an ambulance was a breach of its ministerial duty to provide "ordinary care" to the boy. The trial court based its judgment in favor of the family on these findings of fact.

¶53. Given our deferential standard of review, these ample findings of fact by the trial court compel us to affirm the verdict. Because the majority instead reverses, I respectfully dissent.

## UNDISPUTED FACTS

¶54. A substitute bus driver for the Simpson County School District realized her school bus had broken down and instructed the students to get off the bus. One of the students was eleven-year-old Jacob. The sixth-grader later recalled that day was a little different than others because there were no teachers or administrators in the area to supervise the students.

¶55. Jacob began playing tag with some other boys, and during the game, he was pushed down. During trial, he testified that one of the boys then stomped on his leg. While it was never clear how it happened, Jacob's left leg was visibly broken.

¶56. Testimony would establish the little boy's leg was "bent all the way back behind [him]." When asked if there were any teachers, principals, or other school personnel near, Jacob would say, "No sir," since "[a]ll the teachers had left and it was just [the bus driver]."

¶57. At some point, the substitute bus driver approached the screaming child. Instead of trying to help in any way, she told him to "get up" and that "nothing was wrong with [him]."

But Jacob could not move. While in extreme pain, he lay motionless outside the school. He remembered that "ants starting biting [him], and the sun was getting unbearable" when finally "other teachers started showing up." When asked if anyone helped him when the ants got on him and started biting him, he said, "No, sir, not for a while."

¶58. Finally, "[t]he janitor came out and got me an umbrella for the sun," the boy recalled, since he was still lying where he had fallen. The janitor also sprayed "some ant spray and killed the ants" that had been crawling on him and biting him.

¶59. At some point—when or who exactly is unclear—someone from the school called Jacob's mother. What she remembers being told was terrifying—that Jacob "was not breathing." She "immediately left [her] office and went directly to the school," traveling the thirty-one miles to the school from Collins to Mendenhall Junior High School.

¶60. During that drive, she got a call from the school "asking [her] if [she] would like them to call an ambulance." Shocked, she "asked why an ambulance had not already been called." But she "was not given an answer," and by the time she got to the school, "there was no ambulance." She "kept asking, 'Where's the ambulance? Where's the ambulance?'"

¶61. While there was no ambulance, she did see her "son was on the ground with his leg obviously broke[n]." No school employee was near Jacob—not the principal or any of the teachers. He was just there on the ground while "[a]t least 20, 30 feet away" the teachers were "standing in the shade against the brick wall of the school." She only saw her stepfather by him, trying to comfort the little boy.

¶62. The records from the ambulance company would later reveal it received the call at

3:56 p.m., left a minute later, but did not arrive until 4:36 p.m.

¶63.    Jacob testified he had been lying in the sun for "an hour and a half, two hours" before the ambulance got there. Once paramedics arrived, they attempted to place him on the stretcher, but the pain was "extreme." It was so awful the little boy lost consciousness on multiple occasions. He stated they had to straighten out his leg by "yank[ing] it as hard as they could." The medical records note that he rated the pain as ten out of ten on the pain scale. He was administered morphine until the pain was brought down to a level of three.

¶64.    The ambulance transported him to the hospital, but due to the seriousness of his injuries, he was airlifted to UMMC. His leg required surgery, including "rods all the way up to [his] thigh." The student's injuries also required three months of physical therapy. He remembered he "cried every day" during his therapy.

¶65.    Jacob testified he still suffered from his injury. He stated his knee hurts "all the time" and that he "does not have [his] full range of motion back." Now, he is unable to play sports because his leg "hurts too bad[ly]." His mother testified that she "still notices him limp" around.

## PROCEDURAL HISTORY

¶66.    In its order entered after trial, the trial court held, "The evidence indicated that [Jacob] was on the ground for at least thirty to forty minutes before anyone at the school even called an ambulance or notified his mother." Yet "[t]he School District offered no explanation for this lengthy delay." Regarding Jacob's testimony, the Court found he "was very credible in his testimony that he does not now play sports because [of] his injuries."

¶67. As to the school district's duty, the trial court ruled "Miss. Code Ann. § 33-9-69 imposes upon school districts a ministerial duty to 'use ordinary care and to take reasonable steps to minimize any foreseeable risks to students thereby providing a safe school environment . . . including on the school bus on the way home from school.'"

¶68. Additionally, the trial court held:

> The Court recognizes that a school district does not have the duty of providing constant supervision of all movements of pupils at all times. There must be a proximate causal connection between the inadequacy or lack of supervision and the accident. . . . However, in this situation it was not normal school time wherein the students were expected to be in class, the lunchroom, playground or the like. This situation was one where students were left *essentially unsupervised* on campus outside normal circumstances for some period of time.

(Emphasis added). Last, the trial court held that "[w]hile the burden of proof remains with the Plaintiff, the School District failed to call one eyewitness or offer any documentary evidence to contradict [Jacob's] and Wigley's testimony." Accordingly, "[t]here was no evidence which contradicted [Jacob's] assertion that he lay on the ground for a very long time." "The evidence clearly showed that no school personnel called his mother or an ambulance for approximately at least 20-30 minutes."

¶69. The trial court found the family incurred $90,737.38 in medical bills, of which nearly $40,000 was from the emergency airlift. Taking into consideration the severity of the injuries, the length of time Jacob went without medical treatment, the length of the recovery, and the pain associated with all of this, the trial court awarded $287,000 to the family.

**STANDARD OF REVIEW**

¶70. The standard of review is well established. "[T]his Court ought *and generally will*

33

*affirm* a trial court sitting without a jury on a question of fact unless, based upon substantial evidence, the court must be manifestly wrong." *Jackson Pub. Sch. Dist. v. Smith*, 875 So. 2d 1100, 1102 (¶9) (Miss. Ct. App. 2004) (emphasis added). "This Court must examine the entire record and *accept that evidence which supports or reasonably tends to support the findings of fact made below*, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact." *Id*. (emphasis added).

**DISCUSSION**

¶71. Mississippi law is as established as the standard of review. "Public schools have the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment" to learn. *Chaffee ex rel. Latham v. Jackson Pub. Sch. Dist.*, 270 So. 3d 905, 907-08 (¶11) (Miss. 2019). The responsibility to care for a child while in the custody of school is a ministerial duty since "[i]t shall be the duty of each superintendent, principal and teacher in the public schools of this state . . . to observe and enforce the statutes, rules and regulations prescribed for the operation of schools." Miss. Code Ann. § 37-9-69 (Rev. 2019).

¶72. This responsibility includes that all "superintendents, principals and teachers shall hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess." *Id*. "If the School District's conduct is deemed ministerial, it is then protected from liability *only* if ordinary care is exercised in performing or failing to perform the statutory duty or regulation." *Swindle v. Neshoba Cnty. Sch. Dist.*, 137 So. 3d 869, 875 (¶17) (Miss. Ct. App. 2013) (emphasis added).

34

¶73. In one case where the Supreme Court examined this ministerial duty, an eleven-year-old student was hurt after he was taunted and eventually punched in the face by another student in the presence of their teacher. *Henderson ex rel. Henderson v. Simpson Cnty. Pub. Sch. Dist.*, 847 So. 2d 856, 857 (¶2) (Miss. 2003). The other student had walked over to the victim's desk and made "threatening gestures" like bringing his fist back multiple times as if he were about to hit him. *Id*. After making these gestures "for at least a minute," he punched the student. *Id*. This punch was so hard that the boy "sustained a fractured tooth, a concussion, and a fracture to the inferior orbit beneath his right eye." *Id*. As a result, the child was left with double vision and had to have surgery. *Id*. His medical bills totaled $8,270.43. *Id*.

¶74. His family sued the school district, alleging "it failed to use 'ordinary care' in controlling, disciplining students and providing a safe environment for students." *Id*. The circuit court granted summary judgment, but the Supreme Court reversed and remanded, given that questions of material fact existed. *Id*. at (¶¶4-5).

¶75. The Supreme Court found that "public schools have the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment." *Id*. at (¶3) (internal quotation marks omitted). And "there is no liability predicated on lack or insufficiency of supervision where the event in connection with which the injury occurred is not reasonably foreseeable." *Id*. (internal quotation marks omitted).

¶76. The Court found there was an issue of fact as to "whether the teacher had adequate

35

time and . . . a duty, to intervene in the situation while Price was standing over Henderson brandishing his fist for at least one minute." *Id*. at 858 (¶5). Further, "[t]he teacher's action *or inaction* bears on the question of ordinary care by the teacher in supervising her class and her awareness of what was transpiring." *Id*. at (¶6) (emphasis added).

¶77.    Regarding the teachers' duty to protect students, the Court held that "[t]he teachers and administrators here are then protected by sovereign immunity *if and only if they used ordinary care in controlling and disciplining their students*." *Id*. (citation omitted). "The issue of ordinary care is a fact question." *Id*. (emphasis added) (citation omitted).

¶78.    As in *Henderson*, there was a fact question here of whether the school district tendered ordinary care. The trial court heard all the testimony and made multiple findings of fact, ultimately determining that the school breached its duty to Jacob.

¶79.    The trial court made a finding of fact that the students were left "essentially unsupervised" after being told to get off the school bus. The court also made a finding of fact that school personnel stood twenty to thirty feet away as little Jacob lay in the hot sun with a broken leg and ants crawling all over him. Further, the trial court made a finding of fact that no one from the school called the little boy's mother for at least thirty to forty minutes and subsequently called for an ambulance only after his mother was contacted.

¶80.    This case is not a close one. Allowing a child to lay in the hot sun with a broken leg for *any* period of time before calling 911 was a breach of ministerial duty the school district owed to him, his mother, and every other child. The bus driver saw the injured child lying on the ground but told him to get up and that nothing was wrong with him, completely

disregarding his injuries. Both the little boy and his mother testified that the boy was visibly injured—his leg was bent all the way behind him.

¶81. Whether fourteen minutes or forty, there was a clear lack of urgency on the part of the school district to seek medical attention for the little boy. The failure to immediately call medical help for a visibly injured child leads inescapably to the same conclusion reached by the trial court—that the school district had breached its duty to him.

¶82. The majority segments the liability of the school district into two parts—its supervision of the students and its failure to render aid to Jacob after his leg was shattered. In reality there is only a *single* duty for the school district—to use ordinary care in the exercise of its ministerial duty to provide a safe school environment. The facts then intertwine to show this breach.

¶83. Nor did the school district present an iota of evidence to combat the scene described by Jacob, his mother, and the blunt facts of the medical records. The sole witness for the school testified he was not at the junior high the day of Jacob's injury and agreed he knew "very little" about the case. In our State, "[e]vidence which is not contradicted by positive testimony or circumstances, and which is not inherently improbable . . . is to be taken as conclusive and binding on the triers of facts." *Walmart Assocs. Inc. v. Cauley*, 321 So. 3d 1216, 1231 n.4 (Miss. Ct. App. 2021); *see also Tinnin v. First United Bank of Miss.*, 570 So. 2d 1193, 1195 (Miss. 1990) (stating "the testimony of a witness which is not contradictory, and not incredible, improbable, unreasonable or untrustworthy, must be given weight by the trier of fact, and could not be arbitrarily and capriciously rejected").

¶84. As the trial court ruled, "[t]here was *no* evidence which contradicted [Jacob's] assertion that he lay on the ground for a very long time." (Emphasis added). There was also not a shred of evidence contradicting Jacob's testimony that the children were left unsupervised after they got off the bus or his mother's testimony that the ambulance was not called until after she finally was contacted. Given no other proof was before the trial court, and it correlated with the medical records, the trial court did not come close to committing manifest error in its ruling.

¶85. The majority seems to draw a different timeline than the one determined by the fact finder. However "[w]here there is conflicting evidence, this Court must give great deference to the trial judge's findings." *Thompson ex rel. Thompson v. Lee Cnty. Sch. Dist.*, 925 So. 2d 57, 62 (¶7) (Miss. 2006). The precise amount of delay does not matter—only that there *was* a delay. Even though the boy's leg was visibly broken and was in distress, the school district still did not call for medical help. It was only after Jacob's mother was contacted, and at her request, that medical help was called.

¶86. The trial judge found the testimony of the child and his mother to be credible, and it is beyond dispute the student's leg was horribly broken and required surgery to repair. The school district was careful to present *nothing* in rebuttal, and therefore the evidence presented should be accepted as true.

¶87. Despite the school district's lack of a defense, the majority tries to create one for it—that the teachers perhaps were cautious of helping Jacob because they were scared of liability. This assertion has no basis in fact or law.

¶88. It has no basis in law because precedent establishes the school district's *actual* duty—to provide ordinary care to a child in its custody. The school doesn't have a duty to ignore a hurt child, but to provide children with a safe place to learn. *See Chaffee*, 270 So. 3d at 907-08 (¶11) ("Public schools have the responsibility to use ordinary care and to take reasonable steps to minimize foreseeable risks to students thereby providing a safe school environment."); *J.E. v. Jackson Pub. Sch. Dist.*, 264 So. 3d 786, 791 (Miss. Ct. App. 2018) (¶13) (stating schools have "a ministerial duty to use ordinary care").

¶89. So this dicta by the majority ignores reams of precedent and inverts the school's ministerial duty to provide care to children—in doing so, apparently recognizing a new defense to a claim under the MTCA. But to pretend that the school was trying to avoid liability by letting a child lay in the dirt with his leg broken and ants biting him as he cried is a grotesque distortion of whom the law is supposed to safeguard. The statute was written and has been applied for years not to protect a school from some imaginary possibility of liability, but to safeguard children from harm.

¶90. The trial court alone saw and heard the testimony of these witnesses. "Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demeanor." *Culbreath v. Johnson*, 427 So. 2d 705, 708 (Miss. 1983). "He was there on the scene." *Id*. "He smelled the smoke of battle." *Id*. "He sensed the interpersonal dynamics between the lawyers and the witnesses and himself." *Id*. "These are indispensable." *Id*.

¶91. Given our highly deferential standard of review, which requires us to accept that evidence which supports or reasonably tends to support the findings of fact made below, we

are bound to accept the trial court's findings as conclusive.  There is not a shred of proof that would compel a different result.  Because we must affirm given our standard of review, I respectfully dissent.

**CARLTON, P.J., JOINS THIS OPINION.  WESTBROOKS AND LAWRENCE, JJ., JOIN THIS OPINION IN PART.**